DUBLIN SENIOR COMMUNITY LIMITED PARTNERSHIP, APPELLANT, *v.* FRANKLIN COUNTY BOARD OF REVISION ET AL., APPELLEES.

[Cite as *Dublin Senior Community L.P. v. Franklin Cty. Bd. of Revision* (1997), 80 Ohio St.3d 455.]

*Taxation — Real property valuation — True value of congregate living facility — Decision of Board of Tax Appeals must state what evidence it considered relevant in reaching its value determinations.*

(No. 97-4 — Submitted August 27, 1997 — Decided December 31, 1997.)

APPEAL from the Board of Tax Appeals, No. 95-S-390.

Appellant, Dublin Senior Community Limited Partnership ("Dublin"), filed a real property valuation complaint with the Franklin County Board of Revision ("BOR") for tax year 1993 alleging a true value for its property of $3.4 million. In response, the Board of Education of the Dublin City School District filed a countercomplaint alleging that the true value of the real property should be $8.5 million. The Franklin County Auditor valued the real property at $6.68 million.

The land portion of the real property consists of 13.7 acres located in Dublin, Ohio, on the north side of Post Road, near the northwest corner of the intersection of Post Road and Avery Road. Located on the land is a three-story congregate living facility containing 134 apartments.

Robert D. Thomas, co-owner of the management company operating the Dublin facility and a Dublin partner, explained in testimony before the Board of Tax Appeals ("BTA") that a congregate living facility provides senior citizens with apartment housing, plus personal services and common areas. The ages of the residents of such facilities generally are over seventy-five. The apartments contained in such facilities are slightly smaller than typical apartments. The apartments are connected by interior hallways to common areas that contain a

kitchen, dining, library, exercise, and recreation rooms. Thomas testified that congregate living facilities usually provide emergency pull-cords in each of the apartments, a twenty-four-hour staff, laundry, housekeeping services, and some type of meal program.

Indian Run Retirement Limited Partnership ("Indian Run") built the Dublin facility, completing it in late 1990 or early 1991. Estimates of the construction cost for the facility range from $8.5 million to $10 million. Indian Run financed construction with an $8.675 million construction loan from Mid-America Federal Savings and Loan Association.

On December 13, 1990, the Director of the Office of Thrift Supervision appointed the Resolution Trust Corporation ("RTC") as receiver for Mid-America Federal Savings and Loan Association. The construction loan became in default, and a mechanic's lien foreclosure proceeding was initiated against Indian Run. In response to the mechanic's lien proceeding, the RTC filed an answer, cross-claim, and third-party complaint alleging that it was owed $7.6 million plus interest on the construction loan and that its mortgage was the first and best lien on the property.

Prior to the foreclosure sale, the RTC sold the Indian Run note and mortgage as part of a package of loans to MIF Realty L.P., a subsidiary of GE Capital Corporation. MIF Realty L.P. in turn sold the Indian Run note and mortgage to Dublin for $3.78 million.

Subsequent to its purchase of the note and mortgage, Dublin purchased the property at a sheriff's foreclosure sale for $5.5 million. Dublin, as a first lien holder, used part of its judgment amount against Indian Run for the Indian Run property at the sheriff's sale. The only cash expended by Dublin was for the costs and expenses of the foreclosure sale and the transfer fee.

At a hearing before the BOR, Dublin presented the testimony and written appraisal of Wayne E. Swift, Jr. Swift appraised the property initially at the request of a contractor who had been hired by the RTC to evaluate the property, prior to the sale of the note and mortgage. In his appraisal, Swift used the three traditional approaches to value. Swift appraised the property as a retirement facility, with stabilized occupancy, at $4.1 million and at $3.6 million based on the occupancy level as of September 3, 1992. Swift also appraised the project as a conventional apartment facility at $4.525 million assuming stabilized occupancy, and $3.9 million as if it were vacant.

The BOR affirmed the value assessed by the auditor, and Dublin appealed to the BTA.

At the BTA hearing Dublin presented the testimony of appraiser Bruce E. Pickering, who, using the traditional three approaches to value, determined the value of the real property to be $3.57 million.

For his income approach, Pickering used rental rates based on those of other congregate care facilities in the area. Pickering did not make any allocation of the monthly rental rate between the charge for the apartment rent and the charges for the services and meals provided to the residents. Pickering deducted as expenses both the expenses for the real estate and those expenses for services provided to the residents. Using his income and expense figures, Pickering projected a yearly net income of $907,324 based on an assumed stabilized occupancy rate, which he projected would be achieved in four years. Using his estimate of net income and a capitalization rate of 13.87 percent, Pickering computed the value of the property to be $6.54 million.

After those calculations, Pickering deducted an amount of $2.77 million. He described this amount as the present value of the shortfall between the yearly

3

net incomes he projected during his estimated four-year rent-up period and his projected yearly net income, at the assumed stabilized occupancy rate. The net result was a value for the property as of January 1, 1993 of $3.77 million. From this value, Pickering then subtracted $200,000 for the value of the personal property to arrive at a final value of $3.57 million for the real property.

Pickering next determined a value of $6.25 million for his market comparison approach. He again deducted the $2.77 million present value of the rent-up shortfall and the $200,000 value of the personal property from his market comparison value to arrive at a value of $3.28 million.

Utilizing the cost approach, Pickering valued the land at $527,750 and the building at $10.01 million. After deducting normal depreciation, external obsolescence, the present value of the rent-up shortfall and the value of the personal property, Pickering determined a value of $3.74 million. Pickering reconciled the values from the three approaches, placing the most emphasis on the income approach, to determine a final value of $3.57 million.

After analyzing only Pickering's appraisal, the BTA ruled Dublin's evidence not competent and probative, and found the true value to be the auditor's value of $6.68 million.

This cause is now before the court upon an appeal as of right.

_____

*Arter & Hadden* and *Donald G. Paynter*, for appellant.

*Ronald J. O'Brien*, Franklin County Prosecuting Attorney, and *Matthew H. Chafin*, Assistant Prosecuting Attorney, for appellees Franklin County Board of Revision and Franklin County Auditor.

*Teaford, Rich & Wheeler* and *Jeffery A. Rich,* for appellee Dublin City School Board of Education.

4

_____

***Per Curiam***.  Dublin's first contention is that its purchase of the note and mortgage from MIF Realty L.P. was an arm's-length transaction which established the best evidence of true value for the property.  Dublin further contends that the BTA mischaracterized the transaction and misconstrued R.C. 5713.03 by not accepting the purchase of the note and mortgage as a sale that established value. We disagree.

Despite Dublin's claims to the contrary, two separate and distinct transactions resulted in Dublin's acquisition of the real property.  In the transaction between Dublin and MIF Realty L.P., Dublin purchased only the Indian Run note and mortgage and associated documents.  The transaction between MIF Realty L.P. and Dublin did not transfer the fee simple title to any tract, lot, or parcel of real property.  Admittedly, at the time of the purchase of the note and mortgage by Dublin, the mortgage had been declared to be a first priority in the pending foreclosure, and the judgment for the unpaid balance of the note provided Dublin with a credit towards the purchase price that could be used in bidding at the sheriff's sale.  Realistically, however, someone other than Dublin could have made the highest bid at the sheriff's sale and received fee simple title to the property.  Dublin did not receive fee simple title until it received the sheriff's deed.

Likewise, R.C. 5713.03 is not applicable to the transaction between Dublin and MIF Realty L.P.  R.C. 5713.03 provides that if a "tract, lot, or parcel has been the subject of an arm's length sale between a willing seller and willing buyer within a reasonable length of time * * *, the auditor shall consider the sale price * * * to be the true value for taxation purposes."  As we have just decided, there was

5

no sale of a "tract, lot, or parcel" until Dublin received the sheriff's deed for the property.

Moreover, the price that Dublin paid at the sheriff's sale is not a relevant consideration in establishing true value. R.C. 5713.04 prevents the price paid at the sheriff's sale from establishing the best evidence of true value, stating that "[t]he price for which such real property would sell at auction or forced sale shall not be taken as the criterion of its value."

Dublin's second contention is that the real property should be valued at its actual occupancy rate on the tax lien date, rather than at an assumed stabilized occupancy rate, which would not be achieved until sometime in the future. We gree.

Swift's appraisal presented to the BOR and Pickering's appraisal made deductions to compensate for the fact that, on the lien date, the project was a new multiunit project in the rent-up phase which had not achieved a stabilized occupancy rate. Dublin contended that, until the project achieved a stabilized occupancy rate, it should deduct the present value of the yearly shortfalls, calculated as the difference between the actual net income and the projected net income at the stabilized occupancy rate.

In practical terms, Dublin argues that, while a new multiunit project may be worth a certain amount once it reaches a stabilized occupancy, it is worth some lesser amount when it is new and essentially empty.

Dublin cites Ohio Adm.Code 5705-3-03(B) as authority for the concept that its property should be valued based on its occupancy rate on the tax lien date, rather than at its ultimate stabilized occupancy rate. Ohio Adm.Code 5705-3-03(B) provides that "[e]ach lot, tract, or parcel of land, and all buildings, structures, fixtures, and improvements to land shall be appraised by the county

6

auditor according to true value and money, *as it or they existed on tax lien date* of the year in which the property is appraised." (Emphasis added.)

On the other hand, the appellees contend that in this case the occupancy of the project was a function of the business practices of past management and should not be a factor in the valuation for tax purposes.

In *State ex rel Park Invest. Co. v. Bd. of Tax Appeals* (1964), 175 Ohio St. 410, 412, 25 O.O.2d 432, 434, 195 N.E.2d 908, 910, we stated that when an actual sale is not available "an appraisal becomes necessary. It is in this appraisal that the various methods of evaluation, such as income yield or reproduction costs, come into action. Yet, no matter what method of evaluation is used, the ultimate result of such an appraisal must be to determine the amount which such property should bring if sold on the open market." Because no arm's-length sale occurred in this case the only evidence upon which the BTA could base its decision was the appraisals presented to it by Dublin. However, the BTA rejected the proposition contained in the appraisals presented by Dublin that it was entitled to a reduction in value during the rent-up period. The BTA stated that there was no theoretical support in either the testimony or Dublin's brief that would justify the deduction, nor was it aware of any appraisal theory supporting this deduction.

Pickering provided the theory for such a deduction when he stated in his appraisal report that "[i]n instances where there is a time lag between the valuation date and the point in time when the property is projected to reach its 'stabilized' operating level, a discounting process is necessary to account for the difference between the actual net income and the stabilized net income during the rent-up period." Support for Pickering's concept can be found in The Appraisal of Real Estate, American Institute of Real Estate Appraisers (11 Ed.1996) 590, which states that "[t]he appraiser should account for the impact of the rent lost while the

7

building is moving towards stabilized occupancy." Likewise in *Wallery, Assessing Congregate Care Facilities: A Unique Problem in Valuation*, Journal of Property Tax Management (Fall 1991) 11, 13, the author states that congregate care centers often "take five years or more to be absorbed into the market." As a result of the long absorption period the author states that "[a] prudent purchaser would likely require a discount from the construction cost because lease-up or sellout is uncertain * * *." *Id.* at 13.

The ultimate result of an appraisal is to determine the amount that the property would bring if sold on the open market on the tax lien date. It must be evaluated as it existed on that lien date. The BTA acted unreasonably and unlawfully in refusing to consider a reduction in valuation for a new multiunit property that was essentially empty on tax lien day. As pointed out in The Appraisal of Real Estate, at 590, several ways exist to estimate the amount of the deduction that should be taken to reach the true value of a new project prior to rent up. Upon remand, the BTA must evaluate Dublin's evidence to determine whether the appraisal methods and factual evidence presented by Dublin's appraisers were proper and sufficient to prove the amount of the deduction.

In its third proposition of law, Dublin contends that the BTA erred in not considering the Pickering appraisal because he failed to separate real estate income from service income. We disagree.

The property being valued is a congregate care center that comprises a combination of real estate and business activities. Dublin charges for such services as food and housekeeping; these are business activities. It also charges rental for the apartments; that is a real estate activity. Each activity has separate expenses. In a valuation of only the real estate, the two activities must be kept separate. The separation of the income and expenses is important not only when

determining net income, but also when considering a comparison of the sale prices of comparable facilities. See Wallery at 19. While this separation may be difficult, Pickering made no effort to do so.

Dublin presents two arguments to justify Pickering's failure to separate the income and expenses for the two activities. First, it contends that this separation was not always possible. Second, it contends that inclusion of the business net income will result in a value equal to or greater than a value based on the real estate net income alone.

The answer that it is difficult to accurately separate the income and expenses between business and real estate activities is not a sufficient reason not to separate them; it must be done, because we tax real estate in this case.

Moreover, while the use of net income figures that include both the business and the real estate net income may result in a value which equals or exceeds the value determined on the basis of the real estate net income alone, such procedure would not be proper. We are valuing real estate; the addition or subtraction of business income and expenses may distort the valuation of the real estate, and such income and expenses must be deleted.

Dublin contends that by leaving the auditor's valuation intact, the BTA adopted a valuation that exceeds Dublin's valuation that includes both the business and real estate values. Thus, Dublin argues that no value could be approved by the BTA that was higher than Dublin's value. We disagree.

First, as explained above, a valuation which includes business income and expenses is not acceptable for real estate valuation purposes. Second, the burden at the BTA was on Dublin to prove its right to the reduction in value it sought. *Zindle v. Summit Cty. Bd. of Revision* (1989), 44 Ohio St.3d 202, 203, 542 N.E.2d 650, 651. However the BTA found that Dublin's evidence was not competent and

9

probative and that Dublin did not meet its burden to establish a value other than that set by the auditor. The BTA may approve a board of revision value if the appellant does not prove a right to a reduction in value. *Westlake Med. Investors, L.P. v. Cuyahoga Cty. Bd. of Revision* (1996), 74 Ohio St.3d 547, 549, 660 N.E.2d 467, 468.

Dublin's last contention is that it was unreasonable and unlawful for the BTA to ignore the Swift appraisal. We agree.

R.C. 5715.08 provides that the county board of revision "shall take full minutes of all evidence given before the board" and the secretary of the board "shall preserve * * * records of all minutes and documentary evidence offered on each complaint." R.C. 5717.01 provides upon the filing of an appeal to the BTA, the board of revision "shall thereupon certify to the board of tax appeals a transcript of the record of the proceedings of the county board of revision pertaining to the original complaint, and all evidence offered in connection therewith." R.C. 5715.19(G) provides that "[a] complainant shall provide to the board of revision all information or evidence within his knowledge or possession that affects the real property that is the subject of his complaint. A complainant who fails to provide such information or evidence is precluded from introducing it on appeal to the board of tax appeals or the court of common pleas, except that the board of tax appeals or court may admit and consider the evidence if the complainant shows good cause * * *." Finally, R.C. 5717.04 requires that when an appeal is filed with this court from the BTA, the BTA is to file "a certified transcript of the record of the proceedings of the board pertaining to the decision complained of and the evidence considered by the board in making such decision."

A review of the foregoing statutes shows a comprehensive procedure for preserving evidence and presenting it to the BTA. In fact, the evidence contained

in the record to the BTA from the board of revision may be used as the sole basis for deciding the appeal. R.C. 5717.01 permits the BTA to "order the appeal to be heard on the record and the evidence certified to it by the county board of revision."

The statutory transcript that was sent from the BOR to the BTA in this case contained the written appraisal report and the taped, but untranscribed, testimony of appraiser Wayne Swift. Swift's appraisal report and testimony became part of the evidence Dublin presented to the BTA to support its position.

In its brief to the BTA, Dublin reviewed the Swift appraisal for the BTA's consideration. In fact, Dublin spent more space in its brief to the BTA discussing the Swift appraisal than it did the Pickering appraisal. However, a review of the BTA's opinion fails to disclose any recognition or consideration by it of the Swift appraisal. In *Ridgeview Ctr., Inc. v. Lorain Cty. Bd. of Revision* (1989), 42 Ohio St.3d 30, 536 N.E.2d 1157, 1158, we quoted the BTA's opinion in the *Ridgeview* case as stating, " 'This board should and has considered the administrative record (statutory transcript) which the county board of revision is required to file with this Board, giving the record whatever weight this board deems appropriate, even though additional evidence may be and in this case was accepted.' " The BTA should have followed the procedure it outlined in *Ridgeview* and given the record that same consideration in this case. However, we do not know what the BTA thought of the Swift appraisal because its decision is silent on the subject.

If the BTA considered, but did not accept, Swift's appraisal, it should have set forth that fact in its decision, along with its reasons for not accepting the appraisal. In *Howard v. Cuyahoga Cty. Bd. of Revision* (1988), 37 Ohio St.3d 195, 197, 524 N.E.2d 887, 889, we stated, "This court is unable to perform its appellate duty when it does not know which facts the BTA selected in rendering

11

its decision.  We now require it to state what evidence it considered relevant in reaching its value determinations."  Before we can rule on the BTA's decision concerning Swift's appraisal, the BTA must set forth its determination thereon. On remand, the BTA must analyze the Swift appraisal and set forth its reasons for accepting or rejecting it.

Therefore, the decision of the BTA is reversed, and the cause is remanded for reconsideration in conformity with this opinion.

*Decision reversed*

*and cause remanded.*

MOYER, C.J., F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, RESNICK and COOK, JJ., dissent.

_____

**Alice Robie Resnick, J., dissenting**.  I would affirm the decision of the Board of Tax Appeals.

DOUGLAS and COOK, JJ., concur in the foregoing dissenting opinion.